IN THE SUPREME COURT OF FLORIDA, AT TALLAHASSEE. MARCH ADJOURNED TERM, 1859.

*On motion to call a Circuit Judge to the bench, upon suggestion of a disqualification of one of the Justices of the Supreme Court to sit.*

Upon the calling of the case of Griffin, Sheriff, &c., vs. Orman, it was suggested by the counsel for the appellant that the Hon. Thomas Baltzell, the Chief Justice of this Court, was disqualified from sitting at the hearing of the case by reason of his having been of counsel for one of the parties, and a motion was thereupon made to call to the bench a Circuit Judge to sit in his stead. The Chief Justice having retired from the bench temporarily, the following order was passed, viz:

" Griffin, Sheriff of Jackson county, ⎱
            vs.                        ⎰
      Thomas Orman.

" It being suggested to the Court by the counsel for the appellant that the Hon. Thomas Baltzell, Chief Justice, is disqualified to sit at the hearing of this cause by reason of his having been of counsel for one of the parties in the Court below: It is therefore *ordered*, that the Hon. J. Wayles Baker, Judge of the Middle Circuit, be called to the bench to sit and hear the said cause, and that the same be set for hearing on Thursday, the 7th inst.

"It is further ordered, that a copy of this order be certified and handed to the said Judge by the Sheriff of this Court."

This order was passed on the first of April, and a letter was received a few days after from the Judge named in

the order, declining to take his seat on the grounds therein stated. The letter is as follows, viz:

"MONTICELLO, April 4th, 1859.

"Hon. C. H. DuPont:

"DEAR SIR: I was served, a few days ago, with a citation from the Supreme Court, requiring me to sit as a member of the Court in the case of the Sheriff of Jackson vs. Orman, Judge Baltzell being disqualified by reason of his having been of counsel in the Court below. I should obey the summons with cheerfulness but for the opinion of the Chief Justice, recently published. The public are informed by that opinion that the Chief Justice denies to the Supreme Court the power to invite the aid of the Circuit Judges under such circumstances. Justice to myself, as well as to the Associate Justices of the Supreme Court, requires that I should submit this question for its decision. You will be so good as to inform the Court that I respectfully decline to take a seat upon the Supreme Court bench until the Court have considered and decided the question now submitted.

"Very respectfully, yours, &c.,

J. WAYLES BAKER."

The ground of declination is stated by the Circuit Judge to be the position assumed "in the opinion of the Chief Justice recently published," which is alleged to be that "the Supreme Court have no power to invite the aid of the Circuit Judges under such circumstances." We have not those opinions at our command, to see what is the precise position assumed in them, (they being merely newspaper essays, not appearing in the Reports nor in any wise appertaining to the files of this Court,) and if we had, it might involve the question how far it would comport with the dignity of the Court to indulge in the discussion of a point which had been closed and settled by the most

solemn adjudication. Satisfied, however, that his Honor, the Circuit Judge, has been prompted in his course by no feelings of disrespect to the lawful behests of this tribunal, and that he has been influenced only by considerations of delicacy, we consent to remove from his mind, if we can, any doubts which may have been engendered, by showing, as just intimated, *that the question has already been adjudicated and is no longer open for discussion*.

At the January term, 1851, of this Court, this very question arose upon an order calling the late Judge Thomas Douglas to the bench, to sit at the hearing of a cause in which one of the Justices was alleged to be disqualified to sit. On his own motion, suggesting a doubt as to the constitutionality of the 5th section of the act of 1851, under which the Court had been organized, the question was entertained and the bar generally invited to discuss it. The point was ably and elaborately argued by the leading members of the profession, and with singular unanimity they concurred in advocating the constitutionality of the provision contained in that section of the act. After mature and patient deliberation, the Court unanimously affirmed its constitutionality in an elaborate opinion, delivered upon the occasion by Mr. Justice Thompson, one of the then Associate Justices. Upon this conclusion being announced, Judge Douglas took his seat and participated in the hearing of the cause, and thereby evincing (whatever might have been his *individual* opinion) a becoming deference to the judgment of the Court.— *Vide* 4 Flo. Repts., 1.

We know that it has been alleged against that decision being taken as an *authoritative adjudication* of the question that there were no *parties* before the Court upon whom the judgment could be made to operate, and there is such an intimation in the opinion itself; but we think the ob-

jection is more technical than substantial, and this is fully demonstrated by the objection which is likewise made against the authority of the decision subsequently rendered in this very case of Griffin vs. Orman, upon a motion by the present Chief Justice, who was then of counsel for one of the parties, that the cause should be tried before a Court composed of C. J. Wright and Associate Justice Semmes, Justice Thompson being disqualified to sit. The question in that case arose also upon motion, and involved the right of *two* Justices to make a Court for the hearing of appeals, and thus dispensing with the calling in of a Circuit Judge. The bar were again invited to discuss the question, which they did, with the additional aid of the talents of the Western Circuit, and it was then solemnly decided, by a unanimous Court, that the law required the presence and participancy of *three* Justices to constitute a Court for the hearing of appeals. The objection made to the authority of *that* decision is not, as in the former case, that there were no *parties* before the Court, but that Justice Thompson was disqualified to participate in the consideration of the motion by reason of having been of counsel for one of the parties, and that therefore the judgment was illegal, as not having been made by a competent Court. This objection, however plausible it might be on the part of those who hold that it requires *three* Justices to make a Court, is certainly preposterous when attempted to be urged by those who advocate the sufficiency of *two* Judges; for there were at the hearing of the motion two against whom no objection of disqualification could be made. If it be said that the judgment of the two was probably moulded by the influence of the disqualified Justice, and therefore void, the reply is, that no such presumption may obtain in the case of judicial officers of such high grade without debasing the institution to a level that

would deprive it of the public confidence. However the fact may sometimes happen to be in isolated cases, yet it will never be *presumed* that a Judge, standing as the solemn arbiter of the life, property and reputation of the citizen, can be affected by *outside influences of any character whatsoever*. The objection manifestly is the result of a singular confounding of ideas and a strange want of discrimination as to the *extent* of the statutory disqualification. The disqualification is evidently limited to the "determination of the case" in which the Judge may have been of counsel, and does not reach to that higher question, *the organization of the Court*. To hold any other view of the matter would be at once to violate and set at naught a most vital and fundamental principle, and at the same time to declare that in no contingency can the question ever be settled by *judicial judgment*. It is a fundamental principle, growing out of the very necessity of the case, that all bodies invested with the exercise of *supreme* power must have the right to sit upon and determine the question of their own organization. It would be an insult to common sense to argue such a proposition. It is an *axiom*, and to state it is to prove it.

But we have said, that if the decision in that case was not *authoritative*, then the question can never be settled by *judicial authority*, and this must be manifest to the weakest comprehension. It is evident that the question as to the right of calling a Circuit Judge to the bench, or of the competency of *two* Justices to make a Court, can never arise until a case shall come up in which one of the Justices shall be found to be "disqualified or disabled from hearing and determining the cause," and yet the moment that the contingency happens (according to the argument of our opponents,) the Court is disorganized and there exists

27

no tribunal competent to determine the question. If the point is submitted to the whole bench of Judges and decided by them, the decision is objected to on the ground that it was made under the pressure of an outside influence exercised by the disqualified Judge, and yet to submit its determination to *two* Judges, or a bare majority of the Court, it will strike the simplest mind, would be to *beg the question.* The fact is, we are contrained to designate the objection as the extreme of captiousness.

But a simple reference to the true *history* of this discussion will show that it is too late *now* to question its authority as an *adjudication* of the point then under consideration. When the motion was made at the bar that the Chief Justice and one Associate Justice should hear the cause, and the question arose thereon as to their competency to form a Court without calling in a Circuit Judge, Justice Thompson himself suggested the question as to his competency to sit upon the decision of that question; but, upon a moment's reflection, all doubt on that point was dissipated by the unanimous sentiment of the bar present, and, if objection was made by any one, it is not so recorded. And, if objection had been made, it would doubtless have been overruled, as it ought to have been.

To conclude the argument as to the *authority* of the two cases referred to, (for we have not felt ourselves at liberty to re-discuss questions that we consider to have been settled by the body of which we are constituent members,) we remark, that, if there ever was a doubt on that point, the *uniform practice* of our predecessors and our own *acquiescence* for the five years that we have occupied the bench, ought to be sufficient to settle the mind of the most doubting and skeptical. To undertake to raise the question at this day would be attended with the most disastrous con-

sequences; for, it is known to the profession, and so re-corded, that a majority of all the important cases that have been decided for the last seven years have been determined by a Court with the Circuit Judges as a constituent element of its organization.

We conclude, then, that upon sound principle and long acquiescence, there is no ground for the doubt suggested by his Honor, the Circuit Judge, and that he ought to have obeyed the summons contained in the order of this Court.

Had the failure of the Circuit Judge been the consequence of an *obstinate refusal* to obey the citation, another question, of a very grave character, might have arisen as to the power of this Court to *compel* the attendance of its members. Upon this point, we have no hesitancy to declare that the members of the Court are upon the footing of the most perfect equality—they are peers, co-equal in power and dignity—and that neither one, nor even two, have any legal authority to *compel* the attendance of the other. Each is responsible only to the source whence his commission is derived, and the law has wisely provided an ample remedy against the consequences of a neglect of duty by the provision for *removal and impeachment*. To hold otherwise would be to shear the highest judicial tribunal of the State of its appropriate dignity and to bring it into utter contempt and ridicule. The position of a Circuit Judge, when called to the Supreme Court bench, is the same as one of the Justices, and we therefore hold that we have no power to compel the attendance of his Honor Judge Baker.

If we shall have succeeded in removing from the mind of his Honor the obstacle in his way, and contributed in the slightest degree in laying this mischievous and dis-

organizing question, we shall feel that our labor has not been in vain.

We do not arrogate to this argument the designation of an "opinion." It is merely the expression of the concurrent views of two Associate Justices of the Court on a question growing out of an order that they were expressly authorized to issue, under the provisions of the 5th section of the act of 1851, under which this Court holds its organization.

                                                    DuPont, J.

The opinions of the Chief Justice, referred to above, are appended hereto.—REPORTER.

## OPINION BY BALTZELL, C. J.

The Justices of the Supreme Court have no power to make or appoint Judges for the Court, nor has the Legislature such power conjointly with the Judges.

Hon. B. M. Pearson, Associate Justice, being absent and not expecting to attend this session of the Court, has requested that a Circuit Judge be appointed to officiate in his stead during the term.

Whilst the practice of the Court has been to call in such Judge to try a particular case, at no time has an application like the present been made or granted.

The question is a new one, of great importance and interest, as well under the law under which the power is claimed as, the Constitution of the State. This law declares, that "whenever, from any cause, any one or two Justices of the Supreme Court are disqualified or disabled from hearing or determining any cause brought before them, it shall be the duty of the Justices of the said Court

to *notify* the same to any one or two Judges of the Circuit Courts of the time and place when such causes may be set for hearing, and it is hereby made the duty of such Circuit Judge or Judges, when receiving such notice, to attend at the time and place designated, and he or they shall be and are hereby invested with full authority, in conjunction with the remaining Justices or Justice of the Supreme Court to hear and determine the causes of which they were notified aforesaid."—Page 122, Laws 1851–'2.

By a subsequent law, " whenever one or more Judges of the Circuit Court shall, under the provisions of the fifth (the aforesaid) section, hear and determine causes in the' Supreme Court, the said Judge or Judges, for the time during which he or they shall be so engaged in hearing and determining said causes, shall be and constitute a part of the Supreme Court of the State of Florida, anything in the act to which this is an amendment to the contrary notwithstanding."—Ib., p. 125.

There is no provision here for the appointment of a Judge for the term. So far from it, the authority to appoint is restricted to a case of disability in hearing and determining a cause or causes, and the power of the Judge so appointed is confined to the hearing and determining the same. To imply from the language used a power beyond this, so large and extraordinary on the part of the Justices of the Court, is justified by no rule of law with which I am acquainted, and prohibited by considerations of an imperious and overruling character.

The Constitution of the State divides the great powers of government into three departments: vests one of them, the " judicial," in a Supreme Court, Courts of Chancery, Circuit Courts and Justices of the Peace. It declares the character of the power vested thus: "The jurisdiction of the Supreme Court shall be appellate only ;" provides for

the term of office of the Justices, for their election by the people, their commission by the Governor, their appointment by him in case of a vacancy, their taking an oath that they are duly qualified according to the Constitution of the State to exercise the office to which they have been elected, and "that they will, to the best of their abilities, discharge its duties and preserve, protect and defend the Constitution of the State and of the United States," and for their "removal in case of misdemeanor or neglect of duty."

During the Territorial Government, this judicial power was invested in five inferior Judges, termed Judges of the Superior Court. This, after organization into the State, continued by provision of the Constitution, vesting the appellate power for five years in Circuit Judges. At the expiration of this time, in accordance with the directions of this instrument, a separate Supreme Court was organized, to consist of three Justices. These were first chosen by the Legislature, but afterwards, under an express amendment of the Constitution, were elected by the people, and their term of office fixed at five years. The Justices thus elected would seem to be vested with the entire powers of the Supreme Court, unless, indeed, it can be shown that the Circuit Judges can be rightfully associated with them in the discharge of these duties.

The eighth clause of the sixth article of the Constitution provides, that "no Justice of the Supreme Court, Chancellor or Judge of this State shall be eligible to election or appointment to any other and different station or office or post of honor or emolument under this State until one year after he shall have ceased to be such Judge."

The eighteenth clause of the fifth article declares, "that no duty not judicial shall be imposed by law upon the

Justices of the Supreme Court, Chancellor or Judges of the Circuit Courts of this State."

In England, and in other civilized nations, the power of electing or appointing Judges is with the Executive; in the United States, with the Governor, the Legislature or people of the State. Nowhere, in any government, republican, monarchical or despotic, is such power lodged with the Judges.

If it be said that these do not elect or appoint, their selection being confined to the persons designated by the Legislature, this does not cure the difficulty. It shows a joint action of the Legislature and Court, which is not less objectionable than if it were the separate action of each. Such appointment is manifestly not a judicial duty. " No Judge of the Circuit Court shall be eligible to election or appointment to any other and different station or office, post of honor or emolument." Can language be more expressive, more free from ambiguity? If the position of Justice of the Supreme Court be a different station, office, post of honor or emolument from that of a Circuit Judge, then the holding of it by the latter is clearly prohibited. The two offices are treated as different in this section and in various other provisions of the Constitution, and, obviously, if they are the same, then a Justice of the Supreme Court, without any appointment or act of the Legislature, would be Judge of the Circuit, and the latter Justice of the Supreme Court.

It is said in support of the appointment, that the language of the prohibition "points not alone to another station or office, but to one which is also different in its structure, character and duties and the nature of its functions." Admit this and it sustains our position.

The Justices of the Supreme Court are elected by the people of the entire State; of the Circuit, by those of a

particular district. The former elected, commissioned and sworn to perform appellate duties, and them only—the latter duties of an original character. The Supreme Court consists of three Judges, the Circuit of one. The latter acts through the agency of juries, grand and petit, and Solicitor, directly upon the people; the former, without such aid, upon the Circuit Judges, correcting, revising and controling their action, so that difference in structure, character and of duties and nature of functions is clearly apparent. Unusual care seems to have been taken by the framers of the Constitution to give to this provision the largest extension. Thus the prohibition is not confined to one holding an office, but a station, post of honor or emolument, so that the only escape would seem to be by hold'ng that the office of Justice of the Supreme Court of the State is neither an office, post of honor, station nor emolument, which would involve the glaring enormity of committing to an individual having none of these attributes the right of presiding in the highest tribunal in the State to determine, in the last resort, questions and issues in which the life, liberty and property of the citizen are involved.

There is no excuse for giving to the provision a narrow and limited construction. Its object is to confine the officers to the legitimate duties of their offices, is remedial in its character and should have a liberal construction to carry into effect this design. If this were at any time doubtful under past legislation, all difficulty is removed by the payment of two of the Circuit Judges of five hundred dollars each for their services in this capacity, and a permanent provision by a law of the last Legislature for the payment of their expenses, so that the office now is one of emolument.

Other provisions of the Constitution, already alluded to, not so expressly prohibitory or peremptory, yet equally

imperative, will be perceived to have an application adverse to the exercise of the power. By an amendment of the Constitution, the election of the Judges was assumed by the people, without reserve or qualification, except as already stated. It was taken from the Legislature, as at first ordained and their term of office fixed at five years. They were required to have a commission, to take an oath and are subject to removal for misbehavior. Where is the authority of the Legislature to repeal these provisions—to displace this action of the people—resume it again in connection with the Judges—by a mere notification make a Judge of the Supreme Court for the term of a month—instal this person as Judge without election, without commission, without oath and without responsibility, and assign him to the discharge of this duty? If there had been design for a division of power between the people, Legislature and Judges, would the Constitution have been framed as it is? Would not such design have been expressed in language clear and unambiguous? The constitution of a Court of Circuit Judges with the regular Judges has not found favor with the American people, the only instance of the kind being in New York by express constitutional enactment. In all the other States but one, there is a separate Supreme bench or the Judges of the Supreme Court are charged with circuit duty, the latter being the case with the Supreme Court and eight of the Northern States. South Carolina is the solitary instance of an appellate Court made up wholly of inferior Judges.

The question may be thus summed up: The Constitution divides the judicial power into original and appellate, conferring the latter upon the Supreme Court Justices, the former upon the Judges of the Circuit. The Legislature takes a portion of this power from the Supreme Court

28

Judges and gives it to the Circuit Judges, enlarging their jurisdiction so as to make it both original and appellate.

The Constitution declares, that the people, not the Legislature, shall elect Supreme Court Justices. The Legislature and Judges of the Supreme Court, by this law, are to elect and make Justices of the Supreme Court. The Constitution fixes the term of office of the Justices of the Supreme Court at five years. These Circuit Supreme Judges have a term of office of one day, one week, or month, as the case may be. The Constitution provides that the Justices of the Supreme Court shall have a commission, take an oath and be liable to impeachment. These new Legislative Judges have a *notification* as a substitute for all these and the only guarantee for the faithful discharge of duty.

The Constitution prohibits the Judges from the performance of duties not judicial, the Legislature imposes the duty of making a Judge of the Court no where regarded as a judicial duty.

The Constitution provides that no Judge of a Circuit shall hold another office, the Legislature makes him a Judge of the Supreme Court in addition.

Whilst there is such a clear and manifest contrariety— such evident repugnancy in provisions made by the Constitution and Legislature—either one or the other must give way; both cannot exist together. The Legislature derives all its authority from the Constitution, which expressly declares that all enactments contrary to it shall be void. Whilst having these views so free from doubt, it becomes a duty to enquire into the decisions of other Courts, to ascertain the light afforded by them on this interesting question.

In the Constitutional Court of the State of South Carolina, composed of Judges Grimke, Bay, Brevard, Colcock, Nott,

Smith and Gant, the question was, whether the Governor has a right, in case of the sickness of a Judge of the Circuit, so as to be unable to hold Courts, to appoint a person to perform his duty during the remainder of the Circuit. In the opinion delivered, the following admirable sentiments were expressed: "A Constitution is defined by an English Judge to be 'a form of government delineated by the mighty hand of the people.' It is the supreme law of the land; it is the commission from which legislation derives its power; it prescribes their limits and sets their bounds; it says to them 'hitherto shalt thou go and no farther.' A written Constitution constitutes the great difference between a free government and a despotism; for, whether unlimited power is committed to the hands of one person or many, it is equally liable to be abused. Destroy the written Constitution, and the Legislature possesses the same arbitrary and unlimited control over the people as a British Parliament." After saying that some general clauses of the Constitution will confer the power contended for, the Judge proceeds: "But other parts of the Constitution qualify the general power and direct the particular manner in which it shall be exercised. The latter part of the same clause declares that the Judges of each, that is of the Superior and Inferior Courts, shall hold their commissions during good behavior, &c. We find here four indisputable requisites to constitute a Judge of the Superior Court: 1st, he shall be elected by a joint-ballot of both branches of the Legislature; 2d, that he be commissioned during good behavior; 3d, that he shall receive a stated compensation for his service; 4th, that he shall hold no other office of profit or trust. And yet, here is a Judge of the Superior Court appointed by the Governor and not elected by a joint ballot of both Houses of the Legislature, commissioned for a limited time and not

during good behavior, required to render his services gratis and having no stated compensation. All of which is indeed in violation of the different provisions of the Constitution above mentioned. It is said there are no negative words restricting the powers of the Legislature in this respect. But sometimes affirmative words imply a negative of what is not affirmed as strongly as if expressed, and the Constitution must be understood in that sense. It is a form of government established in which they have declared in what manner its different members shall be organized and the Legislature can introduce no other. When the Constitution says the Judges shall hold their commissions during good behavior, it means all the Judges. The object would be defeated and that part of the Constitution became nugatory, if the Legislature could authorize a different mode of appointing Judges and require them to hold their offices for a different term." Cohen vs. Holt, 2 Const. Rep., 661. A case more in point could scarcely be desired. What is more, the Court was unanimous. In confirmation of these views is a decision of the Court of Virginia. In their old Constitution was a provision that the two Houses of the General Assembly shall, by joint-ballot, appoint Judges of the Supreme Court of Appeals and general Court, Judges in Chancery, &c. By an act of the Legislature, the power of granting injunctions was confided to the District Courts. The power of these Courts was contested, and, on reference to the Judges of the General Court, consisting of Tucker, Tyler, Roane, Henry and Nelson, there was a unanimous conclusion that the law was unconstitutional; that the duties required to be performed by the act could only be executed by persons constituted Judges in Chancery in the manner prescribed by the Constitution. They held that the specification in the Constitution of Judges of seve-

ral tribunals led to the conclusion that the tribunals themselves were meant to be separate and divided; that Judges in Chancery could not, by legislative enactment, be required or empowered to sit in the General Court, nor the Judges of the latter to sit in Chancery, or to perform the functions of Chancellor, but that each class of Judges was designed to be restricted, in the performance of duty, to the Courts to which they were severally elected and commissioned.—Harper vs. Hawkins, 1 Virginia Cases, 20.

In Tennessee, a like question was decided, Catron, C. J., now Justice of the Supreme Court of the United States, delivering the opinion. The Judge of a Circuit being sick and unable to perform the duties of his Court, another appointment was made, and the question was, had the Legislature the power to bestow on the Governor or any other agent the authority of appointing Judges of general jurisdiction? It is an axiom in government that that which the Legislature itself had not power to bestow, it cannot confer on an agent; the principal having no authority, the deputy can have none.—1 Yerger, 457.

Whenever a State Constitution prescribes a particular manner in which power shall be executed, it prohibits any other mode of exercising such power on that particular subject. The authority is supported by constitutional provision, and an attempt to render it nugatory would be an attempt at repeal.

"The Constitution being the paramount law, all acts of the Assembly coming in conflict therewith are void. Let us apply this rule to the present case. The fifth article of the Constitution provides, 'that the General Assembly shall, by joint-ballot of both Houses, appoint Judges of the several Courts of law and equity, who shall hold their respective offices during good behavior.' Here the Constitution has made no exception in favor of the Legislature

giving authority by law to an agent to appoint Judges. The two Houses, acting jointly and voting by ballot, is the only appointing power under the Constitution. The Legislature has just as little right to change the appointing power of their own members.

"The 8th section of the Constitution declares that in case all the Judges of the Supreme Court shall be interested in the event of a cause or connected to either of the parties, the Governor shall appoint, &c. This clause never contemplated that the Judge of the whole people and of general jurisdiction, extending to every member of society, should be appointed by the Governor. Cases in Courts which the Judges in office are incompetent to decide, are alone referred to. In all other matters, the regular Judges are in the exercise of their full powers. These the Legislature had no power to take away without resignation or removal. These continued during good behavior, and when they ceased they ceased forever. Here one Judge could have been put out and another put into office by a mere legislative act. If a Judge could be removed for a year, he could forever; and if one could be appointed for so short a time, so he could for any time. If the Legislature could not do this, it could not empower the Governor to do what itself had not power to do." The Court held the orders, decrees and judgments made by this individual void.—Smith vs. ————, 3d Yerger, 271.

My associate differs with me, holding the law constitutional, and that there are two decisions of this Court settling the question. If there are such, they should undoubtedly have great weight in its consideration. On the first organization of the Court, after the election of Justices by the Legislature, my late associate, the Hon. Thos. Douglas, then a Circuit Judge, objected to sitting as Supreme Court Justice, and on this occasion an opinion was

pronounced, which is claimed to be one of the decisions alluded to. The Court then had no idea that they were making a decision, and say so in express terms. " Whether we were wise in thus assenting to consider the subject in its present shape, and to express our opinions thereon, is in itself a question of *doubtful propriety;* yet, we shall feel some gratification if our judgment, although it may be termed extra-judicial, shall express sufficient weight to put the matter at rest."

Again, " the judiciary has no direct delegation of power to declare an act of the General Assembly unconstitutional and void, but is an incidental power unavoidably exercised in administering the paramount law of the Constitution. To call this incidental power into action, there must be a *suit* or *judicial proceeding*, in which a conflict arises, or is supposed to arise, between the Constitution and a statute, and which affects the rights of parties litigant. In the present case, there is no such suit or other proceeding before us, and, if we had a doubt on the subject, it would be our duty to decline giving an opinion until the question was directly presented for adjudication."—4 Flo. Reports, 6.

The remarks contained in the case of Griffin vs. Orman, on a motion to try with two Judges, form the other decision alluded to. Neither on this nor the other occasion is there an expression of the opinion that the appointment for a term was right and proper. The contrary is indeed inferable from the language of the latter case. Thompson, Justice, although disqualified, delivered the opinion and says: " The 8th section of the act of 1845 provides that three Justices shall be a quorum to transact the business of the Court, and if three do not attend on the first day of the term, the Sheriff shall adjourn the Court from day to day for a week, and then if three do not attend, to adjourn

it for the term.   At each point, Tallahassee, &c., the Justices have been prevented from attending on the day appointed by law for the opening of the term, and but for this section the terms would have been lost and much inconvenience would have resulted from ordering extra or special terms."—5th Florida Reports, 336–7.

Was there reasoning or authority adduced in support of either opinion as to this subject, it would tend greatly to enlighten ; but there is little or none here, and small aid is derived from mere *dicta* of Judges on any occasion.   It is gratifying to me to be able to say that my late associate, the Hon. Thomas Douglas, who examined this subject with the research and unwearied patience and assiduity for which he was so distinguished, was fully confirmed in the views I have expressed.

After the fullest reflection, and every desire to sustain the act of the Legislature, I can but feel that it is expressly prohibited by the Constitution.   Indeed, to say that it is not, would be a direct assumption on the part of the Justices to hold an election and cast ballots in the name of the people, declare the majority in favor of an appointee, treat him as having a commission and pronounce him, without any oath of office, fully qualified as a Judge.

----

## OPINION BY BALTZELL, C. J.

1. The Supreme Court is competent to act through a majority of its members.
2. The presence of all is not indispensable to the transaction of public business.

In the absence of the Hon. B. M. Pearson, one of the Associate Justices, the Court being divided on the motion to summon a Circuit Judge to sit in conjunction with

the Chief Justice and the remaining Associate, the question arose as to the power of the two Justices present to hold the term of the Court. Being divided on this question also, and holding the affirmative, I deem it imperative duty to set forth and state the reasons which induced this opinion.

I hold that a *majority* of the Court constitute a quorum for the transaction of the public business—my Associate, that the presence of all the Justices comprising the Court is required. I now proceed to consider each of these propositions:

The question of the competency of a less number than the whole of an appellate tribunal to hear and decide causes, independent of constitutional and statutory provisions, is treated with such clearness and force—such ability, comprehensiveness and power, both on principle and power—by Ruffin, Chief Justice of the Supreme Court of North Carolina, in a capital case on appeal from a refusal of a Circuit Judge to execute the mandate of the Court, as to leave but little to amend or add to the opinion, which I think worthy of being inserted entire. I, however, present only such extracts as are especially pertinent and directly to the point:

"For the purposes of the other question, we will, then, assume that Judge Gaston had died before the last term began, and that his seat had not been filled. The enquiry is, whether, in that case, the two surviving Judges were obliged to hold the Court, or was the whole jurisdiction suspended until the appointment of a successor. Few can doubt on which side our answer would be, if we were allowed to consult our personal ease or private wishes only. It can be understood by any one, and we know by experience that the burden of this office is much lighter

29

when divided among three than two. It is very sensibly so as respects the degree and duration of the labor, bodily and mental. But the difference, in point of responsibility, to one having just views of the functions of a Court of the last resort for causes of all kinds, criminal, common law and equity, is not easily to be conveyed to one who has not known for himself. We had every motive, therefore, apart from a sense of duty, to postpone the exercise of our office until our share of the duties would be smaller and their difficulty diminished. But the judicial power is not conferred on the Judge for his own gratification, either by distinction in station or for its emoluments, but for the public service. If, therefore, the Judge finds he has the power to decide a cause brought before him, a correspondent duty instantly arises that he should decide it. We have no more right to decline exercising a power, conferred by law for the general benefit, than we have to assume powers withheld by the law for the common safety. Accordingly, when the lamented death of Judge Gaston occurred, I can with truth say, my brother Daniel and myself, with a single eye to our public duty, set ourselves earnestly to enquire what the legislative will and the general rules of law authorized us to do in that emergency; and, with all the lights we could get, having come to the conclusion that the judicial power survived, notwithstanding the death of one of the members of the Court, it followed as a corollary that we were obliged to exercise it, and proceed in administering the law of the country. It is due to ourselves and to the bar, which, owing to particular circumstances, attended at the time in greater numbers than usual, that we should say, the question did not pass *sub silentio*, nor was the conclusion arrived at upon slight consideration. On the contrary, the Judges thought of it deliberately; and we communicated our views pub-

licly to the bar, inviting their particular attention to it as a body. The next day, I again stated from the bench the opinion the Judges had formed on the point, and the general grounds on which we went; and requested, if the opinion of the bar was different, or if any gentleman had doubts on it, that it should be fully argued. The opinion of the bar was then given unanimously, that the surviving Judges had the power of holding the Court.    *    *

"I then proposed to put our reasons for the opinion into writing, that thereafter it might be seen to have been distinctly determined; but, by general consent, the point was deemed so plain that it was thought no one could doubt on it, and that we might well spare ourselves the pains of writing an opinion.

"I will now, however, state the general views taken by us upon the occasion mentioned, which, indeed, are much the same that we now entertain. Before doing so, however, it may be well to dispose of some matters which really seem too trivial to be introduced to aid in construing a statute constituting a high Court of justice.

"In the first place, then, we admit, that if persons refer a question to the arbitrament of three, the award cannot be made by two of them, but only by all three. But the Judges of this Court are not arbitrators. Although arbitrators are sometimes, by way of similitude and illustration, called Judges of the parties' own choosing, there are great differences between them and us. Arbitrators are appointed by the agreement of the parties, and therefore they must act according to the agreement; and when the agreement is for a decision by three and not by a majority of the three, all must concur; else, it is no award at all. It is a case of mere private power. But we are appointed by the country and to decide causes, whether the parties will or will not, according to the course of the law. Now,

the rule with respect to powers of a public nature, even though not judicial, conferred on several, is, that the decision of a majority is valid.—Co. Lit., 181, b. This is a settled principle of the common law, descending even to aggregate corporations. Thus in the Attorney General vs. Davy, 2 Atk. 212, Lord Hardwick held, that a majority might act, though nothing was mentioned in the charter to that effect. The same doctrine was applied to contracts made by church wardens and overseers of the poor in Rex vs. Beeston, 3 T. R. 592. And the general principle is stated and fully considered in Grindley vs. Barker, 1 Bos. & Pul., 229. The only exceptions to the principle, within our recollection, are juries. The common law wisely requires the verdict of a petit jury to be unanimous; and, in favor of the accused, that a grand jury shall not act by a lean majority, but that a bill must be found by not less than twelve. But a Court of justice is neither a body of arbitrators, nor a jury of either kind.

"We likewise admit, that, if a statute empowers two judicial officers to do a particular act, they must meet and execute it, together, and cannot act separately; as if an appointment of overseers under the 43 Eliz. be signed by two justices, separately, it is bad.—Rex vs. Forrest, 3 T. R., 38. But there can be no majority of two persons which will not include both; and, as that is so, the parties have a right to their united judgment on consultation. But that does not establish that the general rule, that a numerous body, that is to say, consisting of three or more, with powers for public purposes, may act by the major part, does not apply to a Court composed of three or more. On the contrary, it is peculiarly fit that judicial decisions may be made by a majority; else, litigation would be interminable. *So, if two may give the judgment of the Court against the third, two must be competent to hold*

*the Court alone, unless the commissions of the Judges or the statute constituting the Court require, that all three should unite in the judgment, or, at least, that they should all meet together, so as in every case to take the sense of each and every one of them.* A *fortiori,* if one of the three be dead, the survivors, who still constitute a majority of the whole, must be competent to act. It is to be remembered, that the question concerns the exercise of the judicial power, *and that the general interests require that, as it is absolutely necessary to the welfare of the State, and may at all times be needed, it should never be suspended,* unless the legislative will to that effect be plainly expressed, or is to be as plainly implied. We admit, indeed, that if the commissions, or the statute, according to a just interpretation, require all the Judges to unite in opinion, or even to be present when the judgment is given, then less than the whole number can do nothing, from whatever cause the whole number may not have convened. So, if a particular number of a larger body be required, the consequence is the same. Thus the statute, constituting our County Court, and authorizing all the justices, 'or any three of them,' to hold the Court, plainly implies that less than three cannot hold it. But *simply appointing a certain number of Judges of a Court,* exceeding two, does not in itself amount to an enactment that all those Judges should either unite in judgment or in consultation; nor does it import that they should unite in consultation more than in opinion. The question therefore depends upon the proper rules of construction to be applied to statutes regulating or conferring judicial powers, and the true meaning of our statute, ascertained by those rules.

" Now, we begin with the principle, that this is not like the grant of a private power and to be construed strictly, according to the very letter; but that it is of a public

nature, to be exercised for the common weal, and, therefore, may be exercised by the major number of those with whom it is entrusted. ✻ ✻ ✻ ✻ ✻ ✻

"It is said, that all the Judges are required to compose a Court, by force of the term 'Court.' Certainly, that does not necessarily follow; for a Court is often held by a part of those who have the power of sitting in it, and if it were not so, some numerous Courts never would be held, as all the members never would be got together. Then, it is said, that if that be not so, generally, the word is used in that sense in this act. But that is disproved by the fact that the judgments of 'the Court' are given by the majority of the Judges. If all the Judges be necessary to constitute 'the Court,' then all must also be necessary to give the judgments of the 'Court,' as far as the import of that term, in itself, goes. But it is admitted that it is not true in the latter respect, and that the majority may give the 'judgment of the Court.' But upon what principle is that so? It is not in the statute, in words, that two may decide against one. Therefore we must resort to something else to restrain it. It is said that it arises from necessity. But what is the necessity? It must depend upon reasons differing from those which require arbitrators and jurors to be unanimous. Why, plainly, this is the necessity : to prevent the failure of justice by having no decision. It is the old principle of the common law that the interest of the public, that powers of a rare public nature should be exercised, makes it necessary to enable the majority to act in opposition to the minority. A necessity of precisely the same nature, if not to the same extent, calls for the exercise of the judicial power by the majority of a Court in the absence of the minority ; and especially requires that the power shall not become dormant upon the death of a Judge. ✻ ✻ ✻ ✻ ✻ ✻ ✻

"We find, indeed, that we were wrong in supposing that the general rule, in respect to the exercise of powers of a public nature, is applicable to the judicial power. The common law deems it of such high consequence that it shall never be suspended, but that the tribunals of justice should at every term be always open to suitors, that it adopted the principle that each one of several Judges of a Court may hold it.

"Sergeant Hawkins thus lays it down in his chapter on Courts of criminal jurisdiction. He says, that, regularly, when there are divers Judges of a Court of record, the act of any one of them is effectual, *especially if their commissions do not expressly require more.* So, if a writ be directed to two coroners, one of them may not serve it, as it is a ministerial act; but one of them may hold an inquest, because that is an act judicial.—Viner Abr. Coroner D. Thus it appears that, at common law, each Judge has the full judicial authority, unless he be required expressly to exercise it in conjunction with others; as in the *quorum* clause of the commissions in England, or the provision in our act requiring three Justices of the Peace, at least, to compose a County Court. Accordingly, one Judge has often sat on the two benches at Westminster Hall; though, as there is very seldom an occasion for it to be done, he prudently declines the decisions of demurrers or difficult points of law.—3 Chitt. G. Pr. C., 6 to 17." 4 Ire. Rep., 447 to 459.

In continuance of the subject, I propose to offer a few observations, which seem to me not inappropriate. The Superior Courts of Law in England are the King's Bench, Common Plea and Exchequer, each having four Judges, and their mode of action is thus given by Lord Eldon, stating that of the King's Bench, if a difference of opinion takes place amongst them, if three are in Court and

two concur in opinion against the third, that is sufficient; but if all four are in Court, and two are of one opinion and the other two are of a different opinion, in law it is not the judgment of any of them.—11 Vesey, 159.

The Judges of these three Courts, (eight of them,) ex-cluding those who decided the case appealed from, consti-tute an appellate tribunal, the Court of Exchequer Cham-ber, a majority is competent to act.

In the United States, the same course prevails through the common law as announced by the Court in their decis-ions and practice or by constitutional or statutory provis-ion.  Thus it is in the State of Georgia, Alabama, Tennes-see, Kentucky (until recently,) Mississippi, Missouri, Texas, California, Wisconsin, Iowa and Arkansas, composed of three Judges, and in the Federal Government and the other States composed of a greater number, the only ex-ception being New York, where five out of eight are re-quired, and in no instance is unanimity of the whole bench requisite; and in Alabama one Judge is deemed sufficient.  Here it may be proper to observe, that a statu-tory, or even constitutional provision, in affirming the com-mon law adds but little, if any, force to it.  "Where the common law and a statute differ, the common law gives place to the statute, if expressed in negative terms.  Where both acts are merely affirmative, and the substance such that both may stand together, the latter does not repeal the former, but both shall have concurrent efficacy."—1 Black. Com., 90; Ba. Ab. Stat. G.

The decisions of the American Courts are to this effect: "It may be safely said," says Gibson, Chief Justice of the Supreme Court of Pennsylvania, "that any duty of an aggregate organ of the government may be performed by a majority of its members, where the constituting power

has not required a concurrence of the whole."—3 Law Rep.

" There is a train of reasoning and authority to show that in all bodies executing a trust of a public nature, a majority may act."—1 McCord, 52.

The enquiry yet remains as to the law of our own State. During the Territorial government of thirty years, the rules of the majority prevailed by act of Congress, as there were respectively three or five Judges. The Constitution has expressly recognized and announced the great principle of the *jus majorum* in its practical application to the first appellate tribunal it directed to be organized. The third section of the 5th art. Judicial Department devolved the powers and duties of the Supreme Court upon the several Circuit Judges, saying: "They or a majority of them shall hold such sessions of the Supreme Court and at such times as may be directed by law." The first State Legislature organized four circuits and enacted that three of the Judges should be a quorum to hold the Court. The principle of the majority was thus established, both by constitutional and legislative authority. I hold that it pervades the Supreme Court, or appellate tribunal, which the Legislature thereafter organized, being the expression of sovereignty on this subject which became henceforth the controling rule of action—the standard which paramount authority itself deliberately enacted. If this be true, it follows that a legislative enactment requiring the presence of the whole Court, of whatever number composed, would be obnoxious as an infringement of the rule thus established. Nor is the rule of a majority of less than a majority even confined to Courts of Justice proper, but extends to all bodies charged with a public duty. The State Senate is by the Constitution constituted a Court for the trial of impeach·

30

ments; yet, although two-thirds are required for a conviction, as a majority is a quorum, eight members in a body of twenty, in all probability, might be sufficient to convict.—Art. 6, sec. 20, 21; art. 4, sec. 8, Constitution.

A majority of the Legislature is a quorum, so that far less than a majority of the whole number may pass a law. The Governor, Judges, Representatives to Congress and members of the Legislature are elected by a plurality less than a majority of the people. In some of the States North, the strict rule of the majority is preserved in these elections.

The act of 1851, it is said, has the effect of making the presence of all the Justices necessary to the formation of a Court by providing that "when any one or two of the Justices are disqualified or disabled, it shall be the duty of the Justices of the said Court to notify the same to any one or two Judges of the Circuit Court."—Laws 1850, 122.

The design of the Legislature obviously was not to impair, but to increase the efficiency of the Court and enable it to perform its functions without embarrassment or obstruction, and this act should be so construed as to attain this end. We may not impute to the Legislature a disposition to infringe the Constitution by providing a rule differing from that which the paramount law had ordained, nor even to repeal a rule prescribed by a statute or existing at common law, although there was no constitutional provision on the subject; it would not be proper to do so, even if the words, by a literal construction, would bear such a meaning. The power and jurisdiction rightly vested in a high department of the government, indispensable to its proper action, to its very existence, is not thus to be disturbed nor displaced, nor are rules and principles materially affecting it thus to be made and enacted. This is to be done only by language clear, direct and positive—

not by implication nor inference. The Legislature, if designing such an alteration, would have said in express terms: "A majority shall not act—the presence of all the Justices shall be required." Not having said so, their silence is the best evidence that there was no such intention. I hold, then, that the statute is satisfied by calling a Judge or Judges where there is not a competent Court or a majority of the Justices present. Such was the view of the Court of Appeals of South Carolina, consisting of three Judges, under a statute of like import with ours, passed in 1824, declaring, " that if any one or more of the Judges should be absent, sick, dead or disabled, the eldest circuit law Judge should be notified to attend," &c.—7 Statute South Carolina, page 325, enacted in 1825 and '32. Under this provision repeated decisions were made of cases by two Judges, a majority of the Court, the reporter stating the third Judge to be absent, to have been of counsel, &c. 1 Hill's Ch., 10, 14, 25, 32; 2 Hill & Bailey's Equity Session.

The names of the Judges, Nott, Colcock, David Johnson and Harper, are a sufficient guarantee for the legality of the action and an authority almost irresistible against such a provision operating as a repeal of the majority rule.

A reference to the rules of construction of statutes will still further sustain this view of the subject. Statutes are to be construed in reference to the principles of the common law; for, it is not to be presumed that the Legislature intended to make an innovation further than the law absolutely required. The law rather infers that the act did not intend to make any alteration other than what is specified and besides what is plainly specified; for, if such had been the design of Parliament, they would have expressed it.—2 Dwarris, 675.

"There are three points to be considered in the con-

struction of all remedial statutes: the old law, the mischief and the remedy; and it is the business of the Judges so to construe the act as to suppress the mischief and advance the remedy."—1 Black. Com., 87.

The invariable rule of construction in respect to the repealing of statutes by implication is, that the earliest act remains in force unless the two are manifestly inconsistent with and repugnant to each other. And it is a general rule that subsequent statutes which institute new methods of proceeding, do not repeal former methods of proceeding ordained by preceding statutes without negative words.—2 Dwarris on Statutes, 174; Mitchell vs. Duncan, 7th Fla., 18. Statutes directing the mode of proceeding by public officers are advisory and not essential to the validity of the proceedings themselves, unless it be so expressed.—5th Wend., 480; 3 Mass., 230; 2 Florida, 118.

So that, without a constitutional provision, this law of 1857 would not have the effect of repealing the statute and common in law force on this subject at the date of its passage. I have held, in an opinion already pronounced, that the Circuit Judges were ineligible by the Constitution to any such position. If so, this would present an insuperable objection to the proposed operation of this law. For if the provision be a nullity on this account, there will be obviously no will of the Legislature.

Some, indeed, contend that the Circuit Judges are yet continued and vested with powers of the Justices of the Supreme Court under the Constitution, the Legislature not having (as they say) *otherwise provided.*

If this be so, a law imposing provisional duties is a nullity. It would seem too plain for argument, that when three Justices, constituting the Court, were elected and qulified, this was the " providing otherwise " contemplated by the Constitution, and effectually dispensed with

further action under the temporary arrangement of the Circuit Judges. This subject was presented to two of the Justices at a term held in Marianna, on a motion to hear a case which was refused. It is not a little remarkable that the opinion overruling the application was prepared and delivered by a Judge who was not one of the Court, being the counsel of one of the parties—a fact almost incredible were it not distinctly admitted.—Griffin vs. Orman, 5 Fla., 333.

If three, the whole number, be necessary to constitute the Court, as is therein asserted, how can two, added to a third disqualified, supply the deficiency? According to their own doctrine, there was not a Court to decide the motion—without a Court there could be no decision. The same objection applies to the opinion pronounced on the occasion of calling in a Circuit Judge.—4 Florida, 4. Thompson, Justice, here also wrote and delivered the opinion, although disqualified in nearly every case in which a Circuit Judge was called during the term.—See cases of Ponder, Lines, Holbrook, &c. The force of the objection, indeed, might be obviated in a degree if the law was correctly set forth in the opinion. The cases cited in support of the motion in Griffin vs. Orman are 2 and 8 East. and 6 Johnson. These I propose to notice very succinctly. The first was an appointment by two Justices of the Peace of overseers of a parish, and a subsequent appointment by two others to the same office. This latter was held bad, the first being declared a good execution of the duty.—2 East., 244. The other was a warrant by two out of five commissioners in bankruptcy, and the objection was that they did not sign together, but it was held good.—8 East., 319.

The remaining case was that of an objection to an award. The Court says: " As this was a delegation of

power for a mere private purpose, it is necessary that all should concur. In matters of public concern, a different rule seems to prevail. Then the voice of the majority shall govern."—6 John., 41.

Adequate investigation could scarcely have been given to the subject by the two Justices composing the Court, or they would have perceived the error of their conclusion as the presence of all the Judges and the opposition of these very authorities to the very doctrine they announced. Such is the decision which I am called upon to regard as authority. I am not insensible to the legitimate force of adjudication in the settlement, not alone of questions of property, but of other controverted points, whether legal or constitutional. It is a decision, however, possessing the attributes peculiar to the term—one in reality and not merely in form, which should receive such deference, and certainly the mere practice of the Court is not entitled to such consideration. If authority were wanted on the subject of the respect due to decisions of this character, it is to be found in the recent decisions of the Supreme Court of the United States on the subject of the Admiralty jurisdiction of their Courts above tide-water and on the lakes. Let the caution of adhering to authority be addressed to those to whom it justly applies, not to one struggling to sustain rule and principle, right and reason, precedent and practice, authoritative decisions of the Courts, and especially to preserve the Constitution and laws of the State from infringement and violation.

If what is claimed here be authority—if such meagre material, such misconception, can be permitted to overturn a rule and principle, the very basis of all republican governments, consecrated by the law in its earliest stages, by the decisions and practice of all the Courts of all countries, the laws of the State and of all the States, and the

Constitution of the State, and nearly all the States—a rule indispensable to right action, almost to the very existence of the Court itself—then, indeed, we may pause and enquire whether there is anything under the government which can be considered reliable or secure from invasion.

There is not here the specious apology given in Milton vs. Blackshear and other cases, for making a new law or rule by the Court, such a want of harmony in the authorities, a painful conflict, " a bewildering light."—7th Flo., 157. Nor in the practical operation and effect of such a rule can any advantage be found; for, if in the case of a Court made of two Justices and a Circuit Judge, a difference arises, one Justice and a Circuit Judge being for reversal whilst the other Justice is for affirmance, then there will be two Judges in favor of the judgment and two against it, counting the Circuit Judge who made the decision as one—a Justice of the Supreme Court and Circuit Judge on each side of the question—the very case in which, by the judgment of all Courts, and especially of this, there should be no decision.—See Frazier vs. Willy, 2 Florida. This cannot exist with a Court consisting of a majority of two Justices of the Supreme Court. The inconveniences and injury resulting from such a rule are stated with great force by those two distinguished writers and statesmen, Mr. Madison and Mr. Hamilton, in the Federalist. Although designed for legislative bodies, their remarks have also a pertinence and application to Courts of Justice.

" The necessity of unanimity in public bodies," says the latter, " or of something approaching towards it, has been founded on a supposition that it would contribute to security; but its real operation is to embarrass the administration, to destroy the energy of government and to substitute the pleasure, caprice or artifices of an insignificant, turbulent or corrupt junto to the regular deliberations of a

respectable majority. In those emergencies of a nation in which the goodness or badness, the weakness or strength of its government is of the greatest importance, there is commonly necessity for action. The public business must in some way be carried forward. If a pertinacious minority can control the opinions of the majority, in order that something may be done, a majority must conform to the views of the minority, and thus the sense of the smaller number will overrule that of the greater."—No. 22.

"It has been said," says Mr. Madison, "that more than a majority ought to have been required for a quorum, and, in particular cases, if not all, more than a quorum, for a decision. In all cases where justice or the general good require new laws to be passed, or active measures to be pursued, the fundamental principles of free government would be reversed. It would no longer be the majority that would rule; the power would be transferred to the minority."—No. 58.

Disclaiming the imputation of unworthy motives, it will be readily seem that the same result would follow the non-attendance of a single Judge, from accident or other cause, in which event the business of the Court would be obstructed and defeated, this great department of the government would be reduced to nonentity and perfectly paralyzed. Satisfied, for these reasons, that two Justices of the Supreme Court are authorized, under the Constitution, to hold the term, I propose to proceed to the transaction of the public business.